UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff/Respondent, | ) ) | No. 5:17-CR-118-KKC-HAI-1 |
| v. | ) ) | RECOMMENDED DISPOSITION |
| KATHARINE E. MATTHEWS, | ) ) | |
| Defendant/Movant. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

In 2020, following a jury trial, federal prisoner Katharine Matthews was sentenced to 168 months upon her convictions for conspiracy to distribute five kilograms or more of cocaine and conspiracy to commit money laundering. D.E. 667.

In May 2023, assisted by counsel, Matthews moved to vacate her sentence under 28 U.S.C. § 2255. D.E. 774 (motion form), 780 (corrected motion form), 781 (memorandum). Matthews alleges ineffective assistance of her CJA trial counsel, Andrew Stephens, now deceased. Matthews alleges Stephens (1) failed to negotiate a plea agreement or relay potential plea offers; (2) failed to review with Defendant all the discovery documents provided to the defense; and (3) inadvertently gave the government a document Matthews had created that included her proposed trial strategies. D.E. 781. The government responded in opposition. D.E. 787. Matthews replied. D.E. 789. On February 8, 2024, the Court conducted a hearing in Lexington. D.E. 800. Matthews and her mother testified. D.E. 799. The government provided the testimony of (1) the government's paralegal at trial; (2) Mr. Stephens's office assistant, and (3) Mr. Stephens's significant other, who also worked as an attorney in an office adjoining Mr. Stephens's. *Id.* The

transcript is filed at Docket Entry 802.  The parties filed post-hearing briefs.  D.E. 807, 810.  The undersigned now recommends that the motion to vacate be denied.

## I. Legal Standards

Under § 2255, a federal prisoner may seek habeas relief because his or her sentence violates the Constitution or federal law, the federal court lacked jurisdiction to impose such a sentence, or the sentence exceeds the maximum authorized by law.  28 U.S.C. § 2255.  To prevail on a § 2255 motion alleging constitutional error, a defendant must establish that the error had a "substantial and injurious effect or influence on the proceedings."  *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  A § 2255 movant bears the burden of proving his or her allegations by a preponderance of the evidence.  *McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (per curiam).

To successfully assert an ineffective-assistance-of-counsel ("IAC") claim, a defendant must prove both deficient performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).  Courts may approach this analysis in any order, and an insufficient showing on either prong ends the inquiry.  *Strickland*, 466 U.S. at 697.

To prove deficient performance, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  A defendant meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances."  *Id.* at 688.

However, a reviewing court may not second-guess trial counsel's strategic decisions.  *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002).  Thus, "a court must indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

To prove prejudice, a movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome," which requires a substantial likelihood of a different result, not just a "conceivable" one. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. When evaluating prejudice, courts generally must consider the "totality of the evidence." *Id.* at 695.

The Sixth Amendment right to counsel extends to the plea-bargaining process. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012); *Missouri v. Frye*, 566 U.S. 134, 140 (2012). Thus, during plea negotiations, defendants are entitled to effective assistance of competent counsel, and the two-part test set forth in *Strickland* applies. *Lafler*, 566 U.S. at 162-63. In the plea-bargaining context, a defendant bears the burden of showing the outcome of the plea process would have been different with competent advice. *Id.* at 163.

## II. Was Mr. Stephens in Cognitive Decline?

Matthews argues that the alleged instances of ineffective assistance were at least partly the result of Mr. Stephens experiencing confusion, memory loss, and other dementia-like symptoms

during his representation.  Her initial memo says Mr. Stephens became more forgetful as the trial

progressed, misspeaking at times and forgetting to use evidence Matthews provided him.  D.E.

781 at 10.  Matthews testified at the hearing that the trial went terribly for her from the beginning:

> From the first day that we came to Lexington and got in the courtroom, there was something -- Andy, there was something wrong.  His memory was not good.  And my mom and I had a discussion, because she's had two husbands that had dementia and then one that had Alzheimer's.
>
> And she looked at me the second day and she said, Katie, I think he has dementia.  Because he really couldn't remember things that I'd said ten minutes ago.  So it was almost like watching a slow train wreck because he couldn't remember holding evidence in his hand when he was cross-examining witnesses. . . .

D.E. 802 at 25-26.

Matthews said that, before she testified at trial, she created a document for Mr. Stephens

to use as a guide:

> As the trial was progressing and there was so much that Andy was forgetting, I felt like I needed to kind of guide him and make -- give him something to hold to remind him what things we had discussed and that we wanted to present.
>
> So I came up -- I wrote out -- so first he hadn't submitted any exhibits yet, which was kind of freaking me out because everybody else had put in probably 10, 20 or more exhibits.
>
> And we -- he had them in his hand when he was cross-examining and then he would let the person lie on the stand and he wouldn't put the evidence down, and it was getting very frustrating. Every time he would sit down, I would say, Andy, you were holding it in your hand, why didn't you put it in?
>
> He said, oh, I'm sorry, I forgot.  I'll get it in some other way.  We have another witness, I can get it in that way and we didn't.  So I was like, I have to testify.  We haven't put any evidence in, you know, we need to submit this stuff and I need to get the story straight.
>
> . . . .
>
> And I had, you know, gone over it with him.  I didn't know how much he was retaining though.  When I was showing him the exhibits, I didn't know how much he was remembering.  So I went and typed up a list . . . .

D.E. 802 at 25-27.

Matthews testified that, after trial, she felt like it had been a "train wreck" because Mr. Stephens had "what I believed to be dementia." D.E. 802 at 39. Matthews contacted another lawyer and made a list of "everything [Mr. Stephens] forgot; everything that he did incorrectly; the times that he forgot evidence. . . . I mean, there was a lot. It was a lot. A lot of things were due to his memory issues." *Id*. at 40. This list was entered as an exhibit at the hearing. D.E. 799-2.

Although Matthews testified about her mother thinking Mr. Stephens might have had Alzheimer's, Matthews's mother did not provide any testimony about any cognitive or memory issues on Mr. Stephens's part.

On the other hand, Mr. Stephens's office assistant and significant other were unequivocal in their testimony that Mr. Stephens was not impaired. Kristina Williamson testified she worked for Mr. Stephens from October 2018 to March 2021. D.E. 802 at 103. When asked whether she had observed dementia or memory issues during the Matthews trial, Ms. Williamson testified, "No, he was on top of his game." *Id*. at 109. The questioning continued:

> Q:  So you worked with him approximately three years, you never saw a mental decline over that period?
>
> A.  No, I did not.
>
> Q.  And he was representing clients regularly in federal court?
>
> A.  Yes.
>
> Q.  Was most of his work in federal court?
>
> A.  Yes.
>
> Q.  And to your knowledge, he wasn't seeing a doctor or, you know, doing anything to deal with mental problems?

A.    No.

Q.    Memory problems?

A.    No.

Q.    Did you find yourself having to remind him on an extra, you know, basis certain things that he needed to know, or was he capable of remembering those on his own?

A.    He was very capable.

D.E. 802 at 110.

Attorney Jackie Horn described her relationship with Mr. Stephens:  "We started out working in the same building and then we ended up being partners, owned a home together, [and] raised kids together for about 12 years [until he] passed March 12, 2021."  D.E. 802 at 115.  Ms. Horn was around during most of the trial.  *Id*. at 123.  She recalled Mr. Stephens working at home a lot during that Covid period, with discovery documents organized into piles on the kitchen island.  *Id*.

Ms. Horn testified concerning Mr. Stephens's mental acuity at the time:

Q.    [Katharine Matthews] suggested that Andy [Stephens] may have been suffering from memory loss at the time of the trial.  You were with him every day; correct?

A.    Correct.

Q.    In the office and at home?

A.    Correct.

Q.    During that time, before the trial, during the trial, or after the trial, did you notice any signs of memory loss or dementia from Mr. Stephens?

A.    No, none whatsoever.

Q.    And you would know that more than anybody else; correct?

A.    Yes, we lived together and we worked together.  Literally the only time we were pretty much apart is if we were in court or -- we still drove two cars to work because

6

he listened to AM radio and I couldn't handle that, so we still drove two cars to work.

So that was kind of my down time, and I ran a lot with the kids to various activities and stuff throughout our relationship.

I know you didn't ask me, but I'll go ahead. Andy didn't even know he had cancer until the week we were told.

He had a crick in his neck and he didn't know why he had a crick in his neck. And this is over -- this is a year after this trial. He had a crick in his neck and so the doctor couldn't send him to physical therapy without some sort of scan or test or something, and that's when they found nodules and that's when he had cancer. We didn't even know anything about that until January 5th of 2021.

Q.    And you said the trial had been over for some period of time before that?

A.    Yes. The trial was back in spring, February, March-ish of 2020 when the world shut down.

Q.    Okay. A broader question. During the time period of before the trial and during the trial, did you notice any complications whatsoever, either physically, mentally, or psychologically with Mr. Stephens?

A.    No, no, not at all. He had a kidney stone sometime in there, but that was a kidney stone and that wasn't unusual. But, no, no, and my mother with Alzheimer's lived with us at the time and Andy would help take care of her and medicines and everything just like me. We were interchangeable there as well. So he also knew mother's schedule, and I never had a problem, you know, he never forgot anything like that.

D.E. 802 at 125-27. The Court also notes that Mr. Stephens's closing argument was very articulate and coherent, drawing on a wide range of evidence from the case. D.E. 692 at 153-79 (transcript).

The Court now finds that the testimony of Ms. Horn and Ms. Stephenson was weighty and credible and more consistent with the overall record than the contrary and self-serving testimony of Ms. Matthews. The Court accordingly makes a factual finding that Mr. Stephens was not suffering from dementia, Alzheimer's, or any other significant cognitive or memory issues during his representation of Ms. Matthews. This factual finding has some relevance to the determination of Matthews's grounds for relief, addressed below.

7

### III. Ground One: Plea Negotiations

Ground One of Matthews's § 2255 form alleges that Mr. Stephens "was ineffective for failing to procure or relay any plea agreement offered to Ms. Matthews." D.E. 780 ¶ 12. Her memorandum explains, "we don't know if Ms. Matthews was ever offered a plea," and "there is no evidence on whether a plea was offered." D.E. 781 at 1. However, "we do know" that the prosecution repeatedly contacted Mr. Stephens, presumably "to encourage cooperation, which would have led to the offering of a plea agreement." *Id.*

According to the government, the prosecution team had no intention of offering a plea agreement unless Matthews agreed to cooperate against other remaining defendants. D.E. 787 at 3. But Mr. Stephens told the government that cooperation was not a possibility. *Id.* Matthews acknowledges that Mr. Stephens understood that Matthews insisted she was factually innocent of the charges. D.E. 781 at 8. In her reply, Matthews insists she should testify and explain that she and trial counsel never discussed a plea agreement—with or without cooperation. D.E. 789 at 2. Matthews was given that opportunity.

At the hearing, Matthews testified on cross-examination that she had no intention of entering a guilty plea at all. D.E. 802 at 56, 64. On redirect, she testified in more detail:

Q.    [I]nitially you proclaimed innocence; right?

A.    Yes, sir.

Q.    And so initially you wanted to go to trial; right?

A.    Yes, I did.

Q.    But as you found out other people were getting [plea] deals, did you ever ask Andy [Stephens] about a deal?

A.    Yeah, we talked about plea deals, the option, and he said it wasn't an option for me.

Q.    And you knew some of your . . . co-defendants were getting minimal time, didn't

you?

A.    Yeah, I found out the day the trial started that they had just gotten to plea the day before.

Q.    And why would he have told you that that wasn't an option for you?

A.    He said that they wanted information and I didn't have any, and he wouldn't allow me to perjure myself.

*Id*. at 74.

Matthews does not mention the plea-offer issue in her post-hearing brief.  D.E. 807.  In fact, the post-hearing brief specifies that Matthews presented "two allegations" at the hearing.  *Id*. at 4.  Nonetheless, in the event Matthews did not intentionally and formally waive Ground One, the Court will address the merits.

The government attached to its post-hearing brief an affidavit from prosecutor Dmitry Slavin.  D.E. 810-1.  Mr. Slavin testifies:  "Along with my co-counsel, I had multiple conversations with Mr. Stephens about the potential of Ms. Matthews pleading guilty and cooperating.  Mr. Stephens repeatedly told us that Ms. Matthews would not consider a guilty plea because she steadfastly maintained her innocence."  *Id*. ¶ 11.  This testimony is consistent with the evidence adduced at the hearing, particularly Matthews's own testimony that her intention was always to prove her innocence at trial.

Based on the evidence before the Court, the undersigned hereby finds the following facts.  Matthews maintained her innocence prior to, and throughout, the trial.  As such, she was not disposed to cooperate to obtain a plea deal.  Matthews's intention was to establish her innocence at trial.  Thus, negotiating an agreement to plead guilty was never part of her defense strategy.  And the government never made any formal plea offer.  The government never initiated any substantive plea discussions because the prosecution believed, correctly and consistently with

defense counsel, that Matthews was not interested in cooperating.  And the prosecution was not interested in offering a plea deal absent cooperation.

Given these facts (which appear uncontested following the hearing), there is no basis for finding deficient performance by Mr. Stephens or prejudice on Ground One.

### IV.  Ground Two:  Text Messages

Matthews alleges in Ground Two that Mr. Stephens was ineffective for failing to review all the discovery with her.  D.E. 780 at 6.  Matthews says that, during cross-examination at trial, "she was presented several documents that she was not aware of.  It was later discovered that these documents were a part of discovery that had been provided to counsel, but never opened."  *Id*. Matthews specified in her testimony that what surprised her was the existence of fifty-plus pages of text messages between codefendant Carlson and herself that had been deleted.  D.E. 802 at 34-36.  Matthews did recall that one page of the deleted text messages was "put on the screen while Rob Carlson was testifying" approximately a month before her testimony.  *Id*. at 34.

Matthews's memorandum alleges that, after trial, her sentencing counsel obtained the discovery from Mr. Stephens "that was still sealed in government tape and had never been opened."  D.E. 781 at 9.  And Matthews presumes these sealed boxes contained the documents (deleted text messages) that prosecutor Slavin cross-examined her about.  *Id*.  She reiterates in her reply that her claim is "that the boxes were still taped in the tape that they were received in, not that they were taped in tape labeled 'government.'"  D.E. 789 at 4.

At the hearing, Matthews testified about her memories of reviewing discovery with Mr. Stephens.  She described how in February 2018, Mr. Stephens sent her a disc of discovery that contained about forty pages of text messages between herself and codefendant Carlson.  D.E. 802 at 21-22.  There were also some financial documents and investigation reports.  *Id*.  Matthews and

Stephens went through that discovery together, in person, in March. *Id*. at 22. Mr. Stephens had it all "printed out" in a binder. *Id*. at 22, 55. Matthews testified she never saw any additional discovery after February or March of 2018. *Id*. at 65. She said that, during subsequent meetings in February or March of 2019 and December of 2019, she and Mr. Stephens reviewed the same discovery materials as during the February or March 2018 meeting. *Id*. at 23-24, 54-56. In sum, Matthews's allegation is that Stephens only reviewed a small portion of the discovery with her because he never even opened a box that contained the fifty-plus pages of deleted text messages that surprised her at trial.

As for the government's witnesses, paralegal Baugh testified that she distributed discovery to the defendants in this case. D.E. 802 at 90. To refresh her memory prior to this hearing, she reviewed her records of what she provided to Mr. Stephens. *Id*. Baugh testified that all discovery was accompanied by "a discovery receipt to defense counsel and those receipts itemized all the items that are provided in the discovery." *Id*. at 93.

Ms. Baugh testified that all the discovery in this case was provided in electronic format—saved to either a hard drive, a flash drive, or a disc. D.E. 802 at 91. Near trial, some discovery was also provided on a cloud-based program called USAFx. *Id*. at 93. The government never sent Mr. Stephens discovery in paper format, much less in boxes. *Id*. at 91.

Ms. Baugh testified concerning the government's trial exhibit 32A, which contained the deleted text messages Matthews was asked about on cross-examination. Baugh said these text messages were provided in discovery to the defense lawyers in December 2018. D.E. 802 at 100. Further, Ms. Baugh testified that this particular exhibit was provided to the defense lawyers as a proposed trial exhibit on February 6, 2020 (prior to the start of trial on February 24, 2020). *Id*. at 94.

11

Prosecutor Slavin has a similar recollection in his affidavit:

2.     The Cellebrite report containing the deleted text messages the Defendant claims she had not seen (marked and presented as Government Exhibit 32A) were provided in discovery in December of 2018.

3.     On 2/06/2020, prior to the start of trial, the Defendant was provided a marked copy of the Cellebrite containing the deleted text messages (Exhibit 32A).

4.     Exhibit 32A, the full Cellebrite containing the deleted text messages, was testified to by a couple of witnesses prior to the Defendant's testimony, Robert Carlson and HSI Special Agent Michael Romagnoli.

D.E. 810-1 at 1.  Thus, there are three circumstantial reasons (discovery production, exhibit production, and prior testimony about this exhibit) why Matthews should have been aware of these deleted texts prior to her testimony.

The next hearing witness, Mr. Stephens's assistant, Kristina Williamson, testified that she received the discovery from the government in the Matthews case.  D.E. 802 at 104.  She did not remember whether any of that discovery came in paper form, but she said the government normally provided discovery in electronic format.  *Id*.  She testified that part of her job was to print all the discovery because Mr. Stephens wanted physical copies of everything.  *Id*. at 105.  She also sent discovery to Matthews, who lived in California.  Some of that discovery was sent to Matthews via email, and some was mailed to her in electronic or paper format.  *Id*.  She remembered multiple discovery productions from the government in this case.  *Id*. at 106.  Mr. Stephens would look at the discovery first, and then tell Ms. Williamson what to send to Matthews and how to send it.  *Id*.

Ms. Williamson also recalled Matthews hiring different counsel after trial.  It was Ms. Williamson who "gathered all notebooks, any flash drives, any pictures that were printed off, and we put them in at least one if not two banker boxes, because I only had binders."  D.E. 802 at 109.  Someone came to pick up those materials in person on behalf of Matthews.  *Id*.

Mr. Stephens's significant other, Jackie Horn, testified last. A lawyer with a separate practice, Ms. Horn shared some office space with Mr. Stephens. Ms. Horn remembered Matthews. She specifically remembered seeing Mr. Stephens and Matthews reviewing discovery together: "[We] had a conference room and I remember looking in and [Matthews] would be in there with Andy and they had piles of documents . . . that were discovery[.]" D.E. 802 at 122. The Matthews case had a particularly large amount of discovery—"more binders, more papers, more pictures than I had ever seen in our 12 years of being in the same law building." *Id*. at 119-20. She remembered Stephens had "banker boxes full of paper . . . that had the discovery printed on it" for this case. *Id*. at 118. According to Ms. Horn, this was one of Mr. Stephens's largest cases, and he had boxes full of binders of discovery. *Id*. at 128-29.

Mindful that Matthews bears the burden of proof, the Court makes the following factual findings. The government provided the deleted text messages at issue to the defense in December 2018. The Court has no reason to doubt that Mr. Stephens's assistant promptly had these text messages printed and provided to Mr. Stephens. Mr. Stephens printed and reviewed large quantities of discovery, far larger than the few-dozen pages worth that Matthews testified about. Matthews and Mr. Stephens reviewed discovery together in February or March of 2019 and again in December of 2019. The Court credits the testimony of Ms. Horn and Ms. Williamson that the discovery materials Mr. Stephens handled were voluminous. On February 6, 2020, the deleted texts were again provided to the defense in the form of a proposed trial exhibit. Some of the deleted text messages were discussed in trial testimony prior to Matthews's testimony. As previously discussed, Mr. Stephens was not experiencing cognitive decline or memory issues. The court credits Matthews's testimony that she felt knocked off-guard by the text messages and did not have a command of their contents at the time of trial.

Additionally, the Court rejects the idea that the government had provided the discovery at issue in paper form inside taped-shut boxes that were never opened.  *See* D.E. 780 at 6; D.E. 781 at 9; D.E. 789 at 4.  The Court finds that all discovery from the government was provided to the defense electronically.  The boxes of discovery seen after trial were prepared after trial by Ms. Williamson for purposes of delivery to Matthews's new counsel.  And it was Ms. Williamson who received the electronic discovery from the government and had it all printed out.  Matthews's assertion that Mr. Stephens failed to even open taped-shut boxes of paper discovery provided by the government is not credible.  This unfounded assertion casts a shadow of diminished credibility on all of Ms. Matthews's testimony.  Additionally, Ms. Matthews and her mother have a strong motivation to overturn her conviction.  This motivation to color facts in Ms. Matthews's favor is presumptively stronger than any motivation of paralegal Baugh, who was only doing her job.  The other witnesses, Ms. Williamson and Ms. Horn, were associated with Mr. Stephens.  While they might not want Mr. Stephens to suffer reputational damage, there is no plausible reason to find they altered their testimony as a result.  All this is to say the government's witnesses were generally more credible.

Given the above facts, Matthews has not met her burden of showing deficient performance.  This case concerns a large trial with voluminous discovery.  And Matthews had a lawyer whom she admits had a stellar reputation.  D.E. 802 at 19.  The strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance is not rebutted.  The presumption stands that Mr. Stephens handled the discovery reasonably under the circumstances.  Further, even if Stephens spent little time discussing the deleted text messages with Matthews, they were Matthews's own messages, so one could presume she was familiar with their contents.

14

There are additional facts in support of the conclusion that Mr. Stephens did not perform deficiently concerning the text messages, but the Court does not give them much weight because they rely on hearsay. Ms. Horn testified that Mr. Stephens was frustrated with Matthews—"He would express frustration that he couldn't get her to focus, [to] concentrate that this is really happening . . . this is really going to go on, these are serious charges. She just didn't understand or didn't want to listen." D.E. 802 at 121-22. Mr. Slavin in his affidavit also states, "Along with my co-counsel, I had multiple conversations with Mr. Stephens about the potential of Ms. Matthews pleading guilty and cooperating. Mr. Stephens repeatedly told us that Ms. Matthews would not consider a guilty plea because she steadfastly maintained her innocence. He also complained that she did not appear to be taking the case seriously." D.E. 810-1 ¶ 11. This consistent testimony from two witnesses is enough for a finding that Matthews was not fully engaged in trial preparation, which could explain her apparent surprise at the use of the deleted text messages at cross-examination.[1] But this finding is not weighty, and it not necessary to the Court's determination that Matthews fails her burden of proving deficient performance.

Prejudice also is not evident on this record. The government's post-hearing memo credibly explains why the evidence against Matthews was strong, even if the deleted text messages had not been in play. D.E. 810 at 14-16. Had the deleted text messages never been utilized at trial, this change does not create a reasonable probability of a different outcome. As the government points out, there is no constitutional requirement that counsel share all, or even certain types of, discovery with the defendant. *Id*. at 12-13. Further, Matthews does not point to any particular text messages whose admission at trial caused her unfair prejudice. Her argument is that encountering the deleted

---

[1] Matthew's mother testified that, when she and Matthews lodged together during trial, Matthews was "all the time" or "most days" working on things for trial, including typing up notes for her lawyer. D.E. 802 at 9-10. However, that Matthews may have been engaged and diligent during trial is not inconsistent with her being checked out in the months leading up to trial when discovery was being reviewed and plea negotiations were possible.

text messages during cross-examination left her visibly flustered. D.E. 807 at 8-9. And she says this failure of composure on the stand may have harmed her credibility with the jury. *Id*. This argument is too speculative to support a finding of a substantial likelihood of acquittal had counsel performed differently. IAC is not established on Ground Two.

### V. Ground Three: Matthews's Notes for Stephens

Matthews alleges Mr. Stephens "was ineffective by providing documents to the government" which included strategy notes written by Matthews that were "only intended for him." D.E. 780 at 8. Her memo alleges that, because Mr. Stephens was so forgetful, she gave him a set of documents to use when he conducted her direct examination. D.E. 781 at 10. These included "brief paragraph[s]" she wrote as commentary. *Id*. at 10-11.

Counsel for the government responded that he had no record or memory of receiving any such documents from Mr. Stephens, and there was no reciprocal discovery provided by Ms. Matthews at all. D.E. 787 at 4. Matthews clarifies in her reply that she is talking about "notes prepared by her to assist defense counsel in her testimony," not anything that would be considered discovery. D.E. 789 at 5.

A copy of the notes in question was entered as an exhibit at the hearing. D.E. 799-1.

Matthews's mother testified that Matthews told her about the note-passing incident and was upset about it. But Matthews's mother did not see it happen herself and she did not recall the notes' subject matter. D.E. 802 at 9-11.

> Q. And [Ms. Matthews] told you that this happened. You didn't see this happen; correct?
>
> A. I didn't, but I saw her writing out her notes.
>
> Q. You saw her make some notes?
>
> A. Oh, yes.

Q.    But you didn't see her -- did you see Mr. Stephens hand them to the government?

A.    I did not, no.

*Id*. at 11.  At this point in the trial, the mother was no longer going to the courthouse.  *Id*. at 13-14.

Matthews's mother also incorrectly believed the notes at issue were handwritten.  *Id*. at 12.  The

document itself is typed.  D.E. 799-1.

In her testimony, Matthews explained that she would "airdrop" documents to Mr.

Stephens's assistant, who could print them (among these was the page of notes at Docket Entry

799-1).  D.E. 802 at 27, 29.

Matthews said she gave these notes to Mr. Stephens "like 24 hours" before she testified.

D.E. 802 at 30.  When she returned from the lunch break that day, Matthews perceived that Mr.

Stephens had

> photocopied [my proposed exhibits], with my notes on top, like a stack, and these [notes] were on top, and when I came back from lunch and I walked into the courtroom, I saw him over with Dmitriy Slavin and he was giving him the stacks.
>
> And I looked, because I was like, surely he's not.  There's no way.  And I looked and I saw this in Dmitriy's hands with these notes on top.  And I sat down . . . and when Andy came back and sat next to me I said, Andy, what did you just give him?  Oh, I just gave him the exhibits so that we save time, so that we don't waste the jurors' time.
>
> And I said, Andy, we already discussed this, you weren't supposed to give him the exhibits beforehand.  And he said, oh, I forgot.  And I said, my notes, you just gave them all my testimony notes.  How could you?  And he said, oh, my gosh, I didn't even realize they were there.  And they were on top.  This is[n't] an exhibit, it doesn't look like an exhibit.
>
> He said, I'm sorry, I just went to my office and photocopied it and just gave them the whole stack you gave me just like you gave it to me.
>
> . . . .
>
> He said he just didn't realize, and, you know, his memory was so bad so I knew he wasn't intentionally doing anything to sabotage me, but at the time, it did feel sabotaging.

*Id*. at 31-32.

Matthews's testimony on this subject was similar to what she said in her email to her lawyer

friend post-trial:

> I prepared my entire testimony with possible exhibits we could use (around 30-40). Since [Mr. Stephens] never took the time to thoroughly go thr[ough] my testimony or prepare me (besides a couple hours going over the softball questions he would ask), I typed out an index of exhibits numbered with explanations of why we should use each one or what they proved so he could study them and be prepared. The day before I testified, he copied all the exhibits, including the index with my notes, and gave them to the prosecutor. He said it was to save time from having to get them to approve each one during his direct the next day. BUT he included the INDEX!!!! I was like, what the f@$? Andy???? That gave them a whole night to prepare based on them and my exhibit notes. Such an idiot move!!!! No other defense attorneys gave the prosecution exhibits in advance of their clients['] testimony. However, my lawyer was SUPER chummy with the prosecutors - a bit too much! He obviously hadn't even read over the exhibit index before he copied it. Don't think he even studied it before my testimony because he only used like 5-10 of them and left out some crucial ones! I have all the ones I wanted to use if we need them later.

D.E. 799-2 ¶ 11.

The document's text is partially italicized. D.E. 799-1. Matthews testified that the

italicized text consisted of notes to explain to Stephens "the significance of this piece of evidence."

D.E. 802 at 29-30. She said the italicized portions were meant to explain what the exhibit "proves

or disproves, or how it helps us." *Id*. at 78.

When questioned by the Court, Matthews said she saw Mr. Stephens provide that specific

document to Mr. Slavin. D.E. 802 at 78. It was "very clear" to her that these notes were on top of

that stack. *Id*. The Court then probed as to whether these notes were used against her:

> Q:    [D]o you have any reason to believe that the government used your comments here against you in the trial?
>
> A:    The only thing that was -- I know was used, was I -- on direct I was asked about a Citation plane, and then when Dmitriy Slavin got up and was cross-examining, he was asking me about a plane that was not asked about. It was a Falcon, and he had

me very confused, because he said on direct you were asked about this. But on there he was asking about a different one. He got confused. But he had it from my notes.

Q:     Just a second. What do you recall being asked about that flight?

A:     It was a plane, that we -- yeah, a jet that we were looking at, and he started asking me questions, trying to throw me, I don't know. He was saying, do you know the difference between a prop plane, or do you know what a jet plane is? Do you know what avionics are? He was asking me a bunch of questions, I was very confused.

       And then he said, well, you were looking -- you testified about wanting to buy this one, and it's not even a jet plane, it's a prop plane. And I was so confused. But then I realized he was talking about a different plane, not the one I testified about.

Q:     So item number 5 on this list says, Email from Rob about buying a Falcon, March 2014 with pictures.

A:     Correct.

Q:     Is that what you're referring to?

A:     Yeah.

Q:     Now, that item is not in italics on this; correct?

A:     No, sir.

Q:     And that means you didn't have any of your own internal analysis or commentary about that issue on this document; correct?

A:     No, but the ones that aren't italicized are kind of like that's what it is, and then italicized was like, further, you know, so it's not, you know, if you just got the evidence, you wouldn't have the title of what it is. Like, I was kind of naming or letting him know, I was trying to guide Andy.

D.E. 802 at 79-80.

      To be clear, there was discussion of the Falcon plane during Ms. Matthews's direct examination at trial. D.E. 576 at 23, 28 (transcript). Matthews appears to have forgotten about this. There is thus no reason to conclude that Mr. Slavin depended on the notes based on the fact he cross-examined Matthews about the Falcon plane.

The government's criminal trial paralegal, Ms. Baugh, testified she had no memory or record of the document. She had not seen it prior to the 2024 hearing. D.E. 802 at 96. Ms. Baugh was at trial every day. *Id*. She testified,

> A:   Normally when something is given to the government, I would be the one that an assistant U.S. attorney, whoever received the document, after they looked it over, then normally it would be their practice to give that document to me to keep track of that document.

> Q.   And you had never seen that document before today?

> A.   Not that I can recall.

*Id*. Upon questioning by the Court, Ms. Baugh testified there was no discussion of any potentially privileged information or inadvertently produced material in Ms. Matthews's case. *Id*. at 100-02.

In his post-hearing affidavit, Mr. Slavin states, "I have been shown Defense Exhibit 1 (Doc #799-1). I do not recall being handed this paper by Mr. Stephens. Even if I were, it did not play a role in my cross-examination of Ms. Matthews." D.E. 810-1 ¶ 10.

On this record, the Court finds Ms. Matthews has not met her burden of establishing prejudice. Assuming Mr. Stephens handed this document to Mr. Slavin as Matthews describes, the Court accepts the testimony of Ms. Baugh and Mr. Slavin that they have no record or recollection of its existence.[2]  The Court accepts Mr. Slavin's testimony that, even if handed to him, the document played no role in his cross-examination. When asked to identify specific prejudice, Matthews suggested that the questions concerning the Falcon plane were inspired by her document. However, the record shows that the Falcon was discussed during direct examination. And the reference to the Falcon in her notes was not italicized, meaning it did not include her independent assessment of the item's significance to the defense. In fact, Matthews's

---

[2] To be clear, the Court does not find deficient performance. It is not at all evident that, if the note was passed to Slavin, this mistake would satisfy the high deficient-performance standard. But it is not necessary to make this determination, given the lack of identifiable prejudice.

note contains little analysis aside from the identification and description of exhibits. As for the Falcon, the note in question merely states, "5. Email from Rob about buying a Falcon plane March 2014 with pictures." D.E. 799-1 at 1. In this context, Matthews has not established prejudice and Ground Three fails.

## VI. Conclusion

Based on the foregoing, the undersigned **RECOMMENDS** that Matthews's 28 U.S.C. § 2255 motion (D.E. 774, 780, 781) be **DENIED.** On none of her three IAC claims does she satisfy her burden of showing both deficient performance and prejudice.

The undersigned further **RECOMMENDS** that no Certificate of Appealability issue. Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *See also* Rule 11 of the Rules Governing Section 2255 proceedings. This standard is met if the defendant can show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). The Court has considered the issuance of a Certificate of Appealability as to each of Matthews's claims. No reasonable jurist would find the assessments on the merits above to be wrong or debatable; thus, no Certificate of Appealability should issue.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. *See also* Rules Governing Section 2255 Proceedings, Rule 8(b). Within **fourteen days** after being served with a copy of this decision, any party may serve and file specific written objections to any or all

findings or recommendations for determination, *de novo*, **by the District Court.**  Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

This the 1st day of October, 2024.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge